Filed 5/18/23  Boyd v. Freeman CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| PAULA BOYD,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>DAVID FREEMAN,<br><br>        Defendant and Respondent. | B316753<br><br>(Los Angeles County<br>Super. Ct. No. BC588216) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Affirmed.

Paula Boyd, in pro. per.; Pollak, Vida & Barer, Daniel P. Barer, Hamed Amiri Ghaemmaghami for Plaintiff and Appellant.

The Jamison Law Firm, Guy E. Jamison and Chelsea M. Clayton for Defendant and Respondent.

In late 2005, respondent attorney David Freeman loaned $425,000 to appellant Paula Boyd, his then-client. Boyd defaulted on the loan in 2007, at which point Freeman initiated foreclosure proceedings against the real property that secured the loan. He later ceased the foreclosure proceedings pursuant to a settlement agreement with Boyd. The settlement agreement modified various terms of the loan, including the term and interest rate. Boyd subsequently defaulted on the modified loan, and Freeman reinitiated foreclosure proceedings in 2012. Freeman purchased the property by tendering a full credit bid at a trustee sale and has been in possession of the property ever since.

Boyd filed the instant action against Freeman, asserting causes of action for wrongful foreclosure, to set aside trustee sale, to void or cancel trustee's deed upon sale, unjust enrichment, and to quiet title. Freeman filed cross-claims for equitable and declaratory relief. After a bench trial, the trial court issued a statement of decision finding, among other things, that the interest rate on the initial loan exceeded 10 percent, the settlement agreement purged the usury, Freeman did not commit any unlawful conduct or act in bad faith, and Boyd's claims based on post-settlement conduct were barred by res judicata. The court entered judgment in favor of Freeman and later awarded him $206,637.50 in attorney fees pursuant to a fee provision in the settlement agreement.

Boyd now contends the court erred in ruling in Freeman's favor and awarding him attorney fees. She argues that public policies against usury and unfair attorney-client transactions invalidate the original loan and everything flowing from it, including the foreclosure, and preclude the settlement agreement

2

from purging the usury. She further argues the fee award must be reversed, because the action was not brought to enforce or interpret the settlement agreement or the rights or obligations of the parties thereunder. We reject her contentions and affirm.

## FACTUAL BACKGROUND

We draw the factual background from the facts and evidence in the record and the trial court's statement of decision. To the extent Boyd requested factual findings on specific controverted issues, we limit application of the doctrine of implied findings. (See Code Civ. Proc., § 634; *SFPP, L.P. v. Burlington Northern & Santa Fe Railway Co.* (2004) 121 Cal.App.4th 452, 462.)

### *Original Loan*

Boyd is a sophisticated businesswoman with a master's degree in accounting. In 2005, she owned a 16-unit apartment building located in Glendale ("the property"). Freeman is a sophisticated businessman with a law degree. In early 2005, Boyd retained Freeman to represent her in connection with an unrelated matter. Freeman represented her in that matter throughout 2005 and early 2006. Boyd was also represented by another attorney, Eugene Alkana, around this time. Alkana was a licensed real estate broker as well as an attorney.

In late 2005, Freeman agreed to loan Boyd $425,000 to purchase a coin-operated laundry business. Boyd discussed the loan with Alkana, who reviewed documents related to the transaction and explained that certain disclosure statements would exempt the loan from usury. Alkana did not advise Boyd "on the propriety or wisdom of making this loan." Freeman had a good faith belief that Alkana provided Boyd with independent legal representation regarding the loan.

3

The loan was effectuated pursuant to a written promissory note secured by a deed of trust on the property. The note provided that Boyd would make monthly, interest-only payments for 12 months beginning on February 1, 2006, at an annual interest rate of 10 percent, followed by a balloon payment of the principal amount. Boyd paid Freeman a loan fee of $8,500, which was deducted from the loan proceeds, as well as $582.19 in interest for the period of December 27, 2005 to January 1, 2006. When the loan fee and additional interest payment were factored into the loan amount, the annual percentage rate of interest exceeded 12 percent.

The final version of the note stated that the note had been "made and arranged by a Real Estate Broker – Mortgage Options." Earlier drafts of the note did not include that language. Mortgage Options is a licensed real estate broker and was paid $500.00 for preparing disclosure documents for the loan. No one from Mortgage Options ever spoke to Boyd.

Boyd made some payments but defaulted on the loan on January 1, 2007. Freeman initiated proceedings to foreclose on the property. Boyd retained attorney David Epstein to represent her. On June 29, 2007, Epstein sent a letter to Freeman in which he expressed concerns that the note was usurious and Freeman was representing Boyd when the loan was made. Epstein also disputed the accuracy of the assertion that Mortgage Options had "arranged" the loan. Boyd was aware of Epstein's concern that the loan was possibly usurious.

### Settlement Agreement and Modified Loan

Epstein and Freeman subsequently negotiated a settlement agreement, which both Boyd and Freeman executed on September 12, 2007. The settlement agreement recited, and the

4

trial court found, that it was the result of an arm's length negotiation between the parties. The trial court also expressly found that the settlement agreement "was the parties' good faith attempt to resolve their disputes" and "was not the result of fraud, undue influence, or any unfair advantage."

Pursuant to the settlement agreement, the parties acknowledged that the principal balance of the loan remained $425,000. The interest rate on the principal balance between December 1, 2006 and March 31, 2007 remained 10 percent, with unpaid interest to accrue at that rate and be added to the principal. From April 1, 2007 forward, however, the interest rate was lowered to seven percent. When the $8,500 loan fee and previous payments of 10 percent interest were included, the resultant effective interest rate was 7.86 percent per year. The settlement agreement also extended the term of the loan to 48 months, with a balloon payment of any remaining accrued interest and principal due on September 30, 2011. The settlement agreement expressly stated that it superseded and amended the original note, though it provided the deed of trust on the property "shall remain in place and shall be acknowledged as valid security for payment of all sums owing as recited above."

The settlement agreement included a mutual release of any and all past and current claims, "including but not limited to any claims arising out of or relating to the Note, Trust Deed, or Foreclosure sale." It also included a mutual and specific release of "any and all rights provided in California Civil Code Section 1542."[1] Freeman agreed to cancel the foreclosure proceedings and waive all late fees and penalties "assessed to date."

_____

[1] Civil Code section 1542 provides, "A general release does not extend to claims that the creditor or releasing party does not

5

The settlement agreement also included the following provision concerning attorney fees: "If any action is brought to enforce or interpret any provision of this Agreement, or the rights or obligations of any Party thereunder, the prevailing Party shall be entitled to recover, as an element of such Party's costs of suit and not as damages, all reasonable attorneys' fees, costs and expense incurred or sustained by such prevailing Party in connection with such action, including, without limitation, legal fees and costs. The 'prevailing party' shall be the Party who is entitled to recover his/her/its costs of suit, whether or not the suit precedes [*sic*] to final judgment."

### *Default and Foreclosure*

Boyd made several payments on the loan before again falling behind. Freeman recorded a notice of default on or about March 21, 2012. The notice identified the defaulted obligation as arising out of the settlement agreement and advised that a trustee sale would occur on July 16, 2012. The notice inaccurately stated the amount of the default and the address of the property.

On July 16, 2012, Freeman purchased the property at the trustee sale by tendering a full credit bid in the amount of $591,397.64.

### PROCEDURAL HISTORY

### *Previous Litigation*

In June 2012, Boyd filed a complaint against Freeman in which she asserted causes of action for legal malpractice, breach

---

know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." (Civ. Code, § 1542.)

6

of contract, breach of fiduciary duty, fraud, and declaratory relief. (See *Boyd v. Freeman* (May 19, 2015, B253500) [nonpub. opn.].) As here, Boyd's claims "were predicated on allegations that after Boyd hired Freeman to represent her in a matter, he made a 'usurious' loan to her secured by a deed of trust for property in Glendale," then "'continued to use his legal status and his usurious loan terms to try to take the property illegally and wrongfully from [Boyd].'" (*Boyd v. Freeman*, *supra*, B253500.) After Freeman's demurrer was sustained with leave to amend, Boyd filed a first amended complaint asserting causes of action for breach of fiduciary duty and restitution under the unfair competition law. The trial court sustained Freeman's demurrer without leave to amend on statute of limitations grounds, and we affirmed.

### Current Litigation

Boyd filed her original complaint in this action on July 16, 2015, and filed the operative first amended complaint (FAC) on November 10, 2015. In the FAC, Boyd asserted causes of action for wrongful foreclosure, to set aside trustee sale, to void or cancel trustee's deed upon sale, unjust enrichment, and to quiet title. She did not mention the settlement agreement.

Freeman demurred to the FAC, asserting Boyd's causes of action were barred by the doctrine of res judicata in light of the previous litigation between the parties. The trial court agreed and sustained the demurrer. Boyd appealed, and we reversed after concluding that the previous dismissal of Boyd's claims on timeliness grounds was not a judgment on the merits. (*Boyd v. Freeman* (2017) 18 Cal.App.5th 847, 850.)

On remand, Freeman cross-claimed against Boyd for equitable and declaratory relief. He also moved for summary

7

judgment or adjudication on each of Boyd's claims. Boyd opposed the motion. She argued there were material issues of fact regarding whether the foreclosure was a usurious transaction; whether the settlement agreement was invalid due to economic duress, undue influence, and unconscionability; and whether Freeman complied with statutes governing non-judicial foreclosure.

The trial court concluded that Boyd's claims based on post-settlement conduct were barred by res judicata, she failed to establish a triable issue of material fact regarding the alleged irregularities in the foreclosure proceedings, and she failed to show economic duress, undue influence, or unconscionability. It nevertheless denied the motion for summary judgment because it found that "usury claims are contained in each of Boyd's causes of action" and Boyd demonstrated triable issues of material fact regarding whether the loan was exempt from usury because it was arranged by a broker and, if not, whether the settlement agreement removed the taint of usury from the original loan.

These factual issues were tried to the court in a bench trial from June 16 to 23, 2021. The court issued a statement of decision in favor of Freeman on July 27, 2021. In addition to the factual findings outlined above, the court determined that the settlement agreement "was supported by valid and legal consideration," "purged the original usury by maintaining this lower legal interest rate" of 7.86 percent, and contained a valid Civil Code section 1542 waiver. It further ruled that Boyd "has not established duress or economic compulsion," and also rejected as time-barred her assertions that the settlement agreement was invalid due to "economic duress, economic compulsion, undue influence, breach of fiduciary duty and violation of Rule 3-300 of

8

the Rules of Professional Conduct."[2]  It also made related rulings that Boyd could not "bring wrongful foreclosure claims [based] on defects predating the Settlement Agreement" without "first rescind[ing] that agreement," and her delay in seeking to rescind the settlement agreement "substantially prejudiced" Freeman. The court found that Freeman "exercised a valid legal right with foreclosure proceedings" and "did not commit any unlawful conduct or act in bad faith."

Despite Boyd's express request, the court did not make any findings concerning whether the original loan was arranged by a broker.  Instead, it found that it "is immaterial whether the loan at issue was actually broker arranged."  The court also found that the mutual releases of claims and Civil Code section 1542 waiver rendered immaterial any potential violations of Freeman's "fiduciary duties in entering into a business transaction with a client and . . . fail[ure] to comply with Rule 3-300 of the Rules of Professional Conduct (current Rule 1.8.1)."  The court entered judgment for Freeman on September 9, 2021.

---

[2]     Former Rule of Professional Conduct 3-300, which was in effect at the time of the events here, provided that "A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client," unless certain requirements were met.  Those requirements included dealing on terms "fair and reasonable" to the client, fully disclosing those terms to the client in an understandable written manner, advising the client to seek and providing time for the client to seek independent legal advice, and obtaining written consent to the terms of the transaction.  (Former Rule of Professional Conduct 3-300.)  This rule has been replaced with current Rule of Professional Conduct 1.8.1.

Freeman subsequently filed a memorandum of costs and a motion for attorney fees based on the attorney fee provision of the settlement agreement. Boyd filed a motion to tax costs and an opposition to the fee motion. She contended the fee provision was inapplicable because her action was not "on [the] contract" of the settlement agreement.

The trial court heard the motions on November 3, 2021. It granted Freeman's motion for attorney fees, finding that it was "undisputed that the parties litigated the issue of whether the settlement agreement purged the taint of usury from the original promissory note" and that Boyd herself acknowledged that "an action is 'on a contract' if it involves or relates to an agreement by seeking to define or interpret its terms or to determine a party's rights or duties under the agreement." The court found Freeman's requested fees to be reasonable and awarded him $206,637.50. The court granted Boyd's motion to tax $44,655 of Freeman's requested costs.

Boyd timely appealed both the judgment and the award of attorney fees.

## DISCUSSION

Boyd asserts that the trial court's factual findings establish that the original loan transaction was usurious and violated the Rules of Professional Conduct. She contends that public policies against usurious transactions and unfair attorney-client transactions "combine to invalidate the foreclosure here." She further contends these "twin policies" overcome any policy favoring settlement of disputes. Boyd also argues that the fee award should be reversed, both because she should be the prevailing party and because the award is not authorized by the settlement agreement.

10

## I.    Standards of review

In reviewing a judgment based on a statement of decision following a bench trial, we generally review findings of fact for substantial evidence and questions of law de novo.  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

Whether a transaction is usurious is a mixed question of fact and law.  (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799-801.)  The "trial court's determination of the historical basis of the transactions—in common parlance, what happened—raises a question of fact. . . . Whether a type of transaction is subject to usury is a question that can have practical significance far beyond the confines of the case then before the court," and thus poses a question of law subject to de novo review.  (*Id.* at p. 801.)  For similar reasons, we review "important questions of public policy de novo."  (*People for Ethical Operation of Prosecutors and Law Enforcement v. Spitzer* (2020) 53 Cal.App.5th 391, 409.)  The legal basis for an attorney fee award is also subject to de novo review.  (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*).)

We presume the judgment of the trial court is correct. As the appellant, Boyd bears the burden of demonstrating, on the basis of the appellate record, that the trial court committed reversible error.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)

## II.    The settlement agreement purged any usury.

Usury is the exacting, taking, or receiving of an interest rate greater than that allowed by law for the use or loan of money.  (*Hardwick v. Wilcox* (2017) 11 Cal.App.5th 975, 978 (*Hardwick*).)  A loan transaction with an interest rate in excess of the legally permissible rate is considered usurious, even where

the parties willingly negotiate it and the borrower is sophisticated.  (*Id.* at pp. 978, 988; *Ghirardo v. Antonioli*, *supra*, 8 Cal.4th at p. 807.)  The legally permissible interest rates for various transactions are set forth in California Constitution, article XV, section 1; there is no dispute that 10 percent was the maximum rate permissible for the loan in this case.

Civil Code, section 1916.1 provides an exemption to the constitutionally mandated interest rates for "any loan or forbearance made or arranged by any person licensed as a real estate broker by the State of California, and secured, directly or collaterally, in whole or in part by liens on real property."  (Civ. Code, § 1916.1.)  The parties dispute whether Mortgage Options "arranged" the loan in 2005, thus exempting it from usury regardless of the effective interest rate, and presented dueling expert testimony on the issue at trial.  The trial court declined to resolve the dispute, concluding instead that it was immaterial in light of the settlement agreement.  Boyd contends that the issue is material, and the trial court's findings "compel[ ] the conclusion that no broker arranged the loan."  We agree with the trial court that the issue is immaterial in light of the settlement agreement: even if the loan was not arranged by a broker and was therefore usurious, any usury was removed by the settlement agreement.

Usury may have repercussions beyond the transaction in which it originates.  Unless the usury is purged, all future transactions connected with or growing out of the original are also considered usurious.  (*Hardwick*, *supra*, 11 Cal.App.5th at pp. 993-994.)  """An original taint of usury attaches to the whole family of consecutive obligations and securities growing out of the original vicious transaction; and none of the descendent

12

obligations, however remote, can be free of the taint if the descent can be fairly traced."' [Citation.]"' (*Id.* at p. 994.) However, "the abandonment of the usurious agreement and the execution of a new obligation for the amount of the actual debt free from the usury and bearing only legal interest, purges the original usury and makes the second obligation valid and enforceable." (*Whittemore Homes, Inc. v. Fleishman* (1961) 190 Cal.App.2d 554, 560.) It has long been recognized that a valid settlement agreement can serve this severing function, so long as it is not the product of fraud, undue influence, or other unfair advantage. (See *Credit Finance Corp. v. Mox* (1932) 125 Cal.App. 583, 586.)

The trial court found that the settlement agreement was an arm's length transaction and the product of good faith negotiations between Freeman and Boyd's independent legal counsel rather than fraud, undue duress, or any unfair advantage. Boyd acknowledges, rightly, that those findings are supported by substantial evidence and thus will stand on appeal. She argues that the settlement agreement nevertheless could not purge the usury of the original loan because "whether a settlement agreement purges usury turns on public policy," and public policies against usury and unfair attorney-client transactions prevent a purge here. We disagree.

Boyd primarily relies on *Hardwick*, *supra*, 11 Cal.App.5th 975, and *Grados v. Shiau* (2021) 63 Cal.App.5th 1042 (*Grados*). Both cases are distinguishable. In *Hardwick*, lender Wilcox made a series of loans to borrower Hardwick over a 10-year period. (*Hardwick, supra,* 11 Cal.App.5th at p. 979.) The loans, which largely rolled into one another, all had interest rates of 11 or 12 percent; the trial court assumed without deciding that the loans were usurious. (See *id.* at pp. 982, 984.) Ultimately, the

13

loans were rolled into two notes, and Hardwick defaulted on one of them. (*Id.* at p. 982.) After Wilcox initiated nonjudicial foreclosure, the parties agreed to enter a forbearance agreement to extend the repayment deadline. (*Ibid.*) The forbearance agreement also contained a general release of any and all claims Hardwick might have against Wilcox, including a waiver of his rights under Civil Code section 1542. (*Id.* at p. 983.) Hardwick subsequently filed suit against Wilcox, seeking to recover usurious interest payments, cancel the forbearance agreement, and prevent the foreclosure Wilcox reinstated. (*Id.* at p. 984.) Wilcox filed a cross-complaint, seeking, among other things, a declaration that Hardwick waived his right to recover any usurious interest due to the release and waiver in the forbearance agreement. (*Ibid.*) Neither Hardwick nor Wilcox was aware of the usury law when they signed the forbearance agreement. (*Id.* at pp. 984-985.)

After a bench trial, the trial court concluded the forbearance agreement did not contain a valid waiver of usury violations. (*Hardwick*, *supra*, 11 Cal.App.5th at pp. 985, 988.) The court made factual findings that the forbearance agreement was a "'descendant obligation growing out of the original usurious loans,'" "an extension of that original usurious transaction," and "usurious in and of itself." (*Id.* at p. 985.) "Under these circumstances, the court found, interpreting the release as a waiver of a usury claim would exempt Wilcox from the consequences of his violation of the usury law" and accordingly violate public policy. (*Ibid.*) The trial court further concluded that even if Hardwick could waive his usury claim, the release contained in the forbearance agreement was "not a knowing waiver of a usury claim, but rather a perpetuation of a violation

14

of the usury law." (*Ibid.*) Wilcox appealed, and the appellate court affirmed.

The appellate court concluded that "the record supports the trial court's finding that construing *this particular release* as a waiver of usury would violate public policy." (*Hardwick*, *supra*, 11 Cal.App.5th at p. 989, emphasis added.) It observed that "the interconnection between the series of 15 notes and amendments to the notes substantially supports the trial court's finding that the Forbearance Agreement was an extension of the underlying usurious loan transaction," and "construing the unilateral general release . . . as a waiver of usury would allow Wilcox to escape the consequences of his violation of the law by permitting him to benefit from his illegal contract and retain the usurious interest he extracted from Hardwick." (*Ibid.*) The appellate court also rejected Wilcox's reliance on case law holding that "a usury claim can be released in a settlement agreement," concluding that "the factual evidence showed that the release was not part of a settlement of a usury claim or of any other dispute. Rather, the sole purpose of the Forbearance Agreement was to extend the due dates for the loans." (*Ibid.*) The court added, "the Forbearance Agreement was not a settlement agreement but an illegal contract that itself violated the usury law." (*Id.* at p. 990.)

Here, the settlement agreement was a legitimate settlement agreement. The trial court found that Boyd was aware the note was possibly usurious when she was negotiating the agreement, and also was aware that Freeman had been representing her as counsel when the note was issued. It further found that Boyd and her independent attorney, Epstein, "knew about the potential existence of a usury claim and knew that she was entering into a settlement agreement to release any and all

15

claims against Freeman."  Unlike the forbearance agreement in *Hardwick*, the settlement agreement contained a mutual rather than unilateral release of claims and lowered the interest rate on the loan to a non-usurious level.  Moreover, the trial court found, and Boyd does not dispute, that the settlement agreement was supported by valid and legal consideration.  "The question comes down to whether the new agreement is a mere renewal of the old usurious agreement, or if it purges the debt of the original usury." (*Whittemore Homes, Inc. v. Fleishman*, *supra*, 190 Cal.App.2d at p. 560.)  The settlement agreement was not a mere renewal of the original loan; it substantially modified the interest rate and other loan terms, and by its own terms amended and superseded the original loan.

*Hardwick* did not, as Boyd contends, "confirm[ ] public policy as the deciding factor on whether an agreement with a release . . . purges usury."  As we emphasized above, the court concluded that the *particular release* in the forbearance agreement would violate public policy by allowing Wilcox to profit from his wrongdoing.  The ruling turned not on public policy but rather on the underlying facts of the transactions and contents of the forbearance agreement.  The facts of this case are not analogous to those in *Hardwick*; its holding is not applicable here.

The same is true of *Grados*, *supra*, 63 Cal.App.5th 1042, which Boyd asserts also stands for the proposition that public policy is the deciding factor in whether a contract can purge usury.  There, Grados lent Shiau $100,000 pursuant to a note that accrued interest at a rate of 20 percent per annum and also required a "$100,000 earn-out payment" on the date of maturity. (*Grados*, *supra*, 63 Cal.App.5th at pp. 1046-1047.)  The note

16

contained a unilateral waiver by Shiau of "any and all laws applicable to the payment of interest in connection with its [*sic*] payment of the Earn-Out Amount." (*Id.* at p. 1047.) After Shiau failed to pay, Grados sued him for breach of contract. (*Id.* at p. 1046.) Grados obtained entry of default and a default judgment in the amount of $217,388.58: $100,000 in principal, $100,000 in earn-out, $16,163.05 in pre-judgment interest calculated at the statutory rate of 10 percent from the alleged date of Shiau's default, and $1,225.53 in costs. (*Id.* at p. 1047.) Shiau moved to set aside the default and default judgment. As relevant here, he argued that the $100,000 earn-out requirement in the note (and awarded in the default judgment) was usurious and rendered the default judgment void. (*Id.* at p. 1048.) He requested that the court at a minimum reduce the default judgment "'to the principal and reasonable interest, legal interest.'" (*Ibid.*) The trial court rejected Shiau's arguments and request and denied the motion to set aside without modifying the amount of the judgment. (*Ibid.*)

On appeal, Shiau argued that the illegal terms of the note and illegal interest rates awarded to Grados rendered the default judgment void, such that the trial court abused its discretion by denying his motion to set aside. (*Grados*, *supra*, 63 Cal.App.5th at p. 1049.) The appellate court agreed that the relief awarded Grados in the default judgment was contrary to law. (*Id.* at p. 1054.) It concluded that the interest rate was 100 percent when the earn-out amount was considered, "ten times above the maximum constitutional rate," and accordingly "rendered that portion of the default judgment void." (*Id.* at p. 1055.) The appellate court also rejected Grados's attempt to invoke the waiver provision of the note. (*Ibid.*) Quoting *Hardwick*, *supra*,

17

11 Cal.App.5th at pp. 989-990, the court concluded that "[a]llowing Grados to benefit from the unilateral provision in [the note] and be awarded the illegal $100,000 Earn-Out Amount, equivalent to the *entire* amount of the principal, would 'undermine the "theory" of California usury law, which is that "society benefits by the prohibition of loans at excessive interest rates, even though both parties are willing to negotiate them."'" (*Grados*, *supra*, 63 Cal.App.5th at p. 1055.) The appellate court accordingly struck the improper portion of the default judgment and modified it to award Grados the $100,000 principal and interest of $8,081.53. (*Id.* at p. 1057.)

Like *Hardwick*, *Grados* involved a usurious agreement that included a unilateral waiver of rights. Those features are not present in the settlement agreement here. *Grados* did not hold, as Boyd suggests, that "purported waivers of usury that run afoul of public policy cannot purge usury." There was no attempt to purge usury in *Grados*, which concerned a single usurious agreement. *Grados* thus does not speak to the issue of whether a settlement agreement that is itself not usurious can purge the usury of a previous agreement.

Boyd argues that another important public policy prevents the settlement agreement from purging usury: the policy "against allowing attorneys to take advantage of the trust their clients place in them by persuading them into unfair, unreasonable business transactions." She asserts that regardless of the terms of the settlement agreement, "at the time Mr. Freeman made the loan to his client, it was usurious, and thus unfair and unreasonable. . . . [T]hat is the time frame that matters." In other words, she contends the original loan was void from its inception as a matter of public policy. She also makes a related

18

argument that the original loan was voidable at any time at her option due to Freeman's alleged violations of former Rule 3-300 of the Rules of Professional Conduct.

The trial court ruled that "Boyd's attempt to invalidate the loan for violation of Rule 3-300 of the Rules of Professional Conduct is barred by the statute of limitations." Indeed, we held as much in the previous litigation between the parties. (See *Boyd v. Freeman* (May 19, 2015, B253500) [nonpub. opn.].) Boyd maintains this ruling was "incorrect," because the instant action did not involve claims of malpractice or breach of fiduciary duty and we previously held that the instant suit was not barred by the dismissal of the previous litigation on timeliness grounds. (See *Boyd v. Freeman, supra,* 18 Cal.App.5th at p. 850.) Even if we assume Boyd is correct, and the trial court erred in invoking the statute of limitations, the trial court alternatively ruled that any violations of the Rules of Professional Conduct were rendered "immaterial" by the mutual waivers and releases contained in the settlement agreement. Boyd has not demonstrated this ruling was erroneous.

The trial court found that Boyd entered into the settlement agreement and released all claims against Freeman with the knowledge that Freeman represented her when the initial loan was made. Boyd cannot overcome these findings, which are supported by substantial evidence in the record.[3] She instead asserts that the policy of "putting an end to claims once they have

---

[3] We also note that we concluded in the previous litigation that "Boyd knew, or should have known, the facts underlying [her] breach of fiduciary duty claims" "no later than the execution of the 2007 settlement agreement." (*Boyd v. Freeman, supra,* (B253500).)

19

been resolved . . . does not overrule the public policies against usury and unfair transactions between attorneys and clients." The only authority she cites for this proposition is *Hardwick*, *supra*, 11 Cal.App.5th 975. *Hardwick* is equally inapplicable in this context, inasmuch as "there was neither a preexisting dispute between the parties as to whether the loans were usurious nor a settlement agreement in compromise of such a dispute." (*Hardwick, supra*, 11 Cal.App.5th at pp. 990-991.) Boyd was represented by independent counsel when she entered into the settlement agreement, and the releases it contained were mutual and supported by valid consideration. Boyd cannot now rely on allegations of professional misconduct to undermine the otherwise valid settlement agreement.[4]

## III.  The settlement agreement authorized the fee award.

Civil Code section 1717, subdivision (a) provides, "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable

---

[4]  Boyd also asserts that irregularities in the foreclosure process, such as the erroneous property address on the notice of default, "exacerbated the violations of public policy," and "disputes" the trial court's findings that she was not prejudiced by the irregularities. We need not address these minimally developed arguments in light of our conclusion that public policy did not undermine the settlement agreement from which the foreclosure arose. In any event, Boyd failed to carry her burden of showing the trial court's findings were not supported by substantial evidence or its legal conclusions were incorrect.

attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).) It is undisputed that the settlement agreement contained a provision awarding attorney fees to the prevailing party where "any action is brought to enforce or interpret any provision of this Agreement, or the rights or obligations of any Party thereunder." Boyd, who contended below that the action was not "on a contract" within the meaning of Civil Code section 1717, abandons that position and now contends the fee provision does not support the fee award because she did not bring an action to enforce or interpret the settlement agreement. She emphasizes that the FAC did not mention the settlement agreement, "let alone seeks [*sic*] enforcement or interpretation of it," and contends that Freeman's efforts to use the settlement agreement as a defense do not constitute "bringing an action to enforce" the agreement within the meaning of Civil Code section 1717.

In considering the scope of the settlement agreement's attorney fee provision, we apply "traditional rules of contract interpretation." (*Mountain Air*, *supra*, 3 Cal.5th at p. 752.) We consider the "mutual intention of the parties," focusing first on the plain language of the provision. (*Ibid.*) However, "a complicated and difficult set of facts may sometimes obscure whether a claim on which attorney fees are incurred is within the scope of a fees provision." (*Id.* at p. 760.) Thus, where "warrant[ed]," we should also consider "'the pleaded theories of recovery, the theories asserted and the evidence produced at trial, if any, and also any additional evidence submitted on the motion in order to identify the legal basis of the prevailing party's recovery.' [Citation.]" (*Id.* at pp. 760-761.)

21

The provision here contemplates an award of fees where "any action is brought to enforce or interpret any provision of this Agreement, or the rights or obligations of any Party thereunder." As the trial court recognized below in its summary judgment ruling, Boyd is correct that she did not expressly assert a cause of action to set aside the settlement agreement. However, it continued, "this is *implicitly* what Boyd seeks by advancing claims to set aside the foreclosure sale of the Property because the Settlement Agreement necessarily impedes those claims." Indeed, Boyd expressly argued below that she brought her wrongful foreclosure claim "to rescind the settlement agreement and void the foreclosure sale." In its statement of decision, the trial court concluded that Boyd could not "bring wrongful foreclosure claims [based] on defects predating the Settlement Agreement" without "first rescind[ing] that agreement."

Boyd's action at its heart, if not in its caption, was brought to determine her rights or obligations under the settlement agreement. The settlement agreement was admitted as an exhibit at trial, which focused largely on the issue of whether the settlement agreement purged the usury present in the original loan. At the conclusion of trial, both parties indicated an intention to seek attorney fees if they prevailed, and explicitly stated they would do so under the settlement agreement. Their mutual intention thus was clear.

We do not "take an overly formalistic approach to determining whether a prevailing party is entitled to contractual attorney fees." (*Mountain Air, supra,* 3 Cal.5th at p. 760.) Freeman incurred fees in an action that determined "the rights or obligations" of the parties under the settlement agreement. The trial court did not err in awarding him those fees.

## DISPOSITION

The trial court's judgment and fee order are affirmed. Respondent may recover his costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, ACTING, P.J.


ZUKIN, J.[*]


---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.